Filed 5/10/23  P. v. Borg CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>TYLER CATLIN BORG,<br><br>     Defendant and Appellant. | D079870<br><br><br><br>(Super. Ct. No. RIF1805408) |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.


Tyler Catlin Borg appeals the judgment sentencing him to prison after a jury found him guilty of first degree murder with a lying-in-wait special

circumstance and a firearm enhancement. He asserts claims of insufficient evidence, instructional error, prosecutorial misconduct, ineffective assistance of counsel, and cumulative prejudice. We affirm.

## I.

## BACKGROUND

### A.  *Events Leading up to Shooting*

Tyler suspected his wife Caroline of infidelity and in May of 2018 put a tracking device on their car without telling her. In December of that year, Caroline sent a text message to Justin Kiernan, a former boyfriend, and arranged to meet him. Caroline drove to Justin's workplace on December 18 and met him in the parking lot. Tyler sent a text message asking Caroline where she was. She responded she was at a shopping mall, but that did not match the information provided by the tracking device. Later that day, Tyler told Caroline about the tracking device and that he knew she had been at a residential address, but she denied going to anybody's house.

Over the next few days, Tyler continued to press Caroline about her whereabouts on December 18, but she did not reveal she had met Justin. During those days, Caroline exchanged sexually explicit text messages and pictures with Justin and discussed how they might circumvent the tracking device and meet without Tyler knowing.

On December 21, Tyler sent Caroline text messages stating: "I'm smart enough to not write down what I am ready to do to any man I know touches you and I'm not sure you believe th[at]. But you should [because] I'm a lot more capable of evil th[a]n you realize[.] There is a thin wall keeping these demons contained and a woman is the only thing powerful enough to break past that wall[.] You better believe I will put everything on the line for you and have no regrets[.]" Caroline responded, "Ok."

2

On December 22 at approximately 12:30 p.m., Tyler took Caroline's cell phone to examine her text messages and social media accounts. He was able to recover 90 days' worth of text messages between Caroline and Justin that she had deleted. There were hundreds of messages about sex. For example, one message "said something about him deep throating her until she would choke and then pulling out and coming in her butt." Caroline eventually "broke down" and told Tyler she had met Justin on December 18. Tyler became very angry because he did not like Justin and thought Justin could take Caroline away from him.

Later on December 22, Caroline decided to drive to her parents' house and went to the car, but when she got there she realized the keys were not in her purse. She returned to the apartment and found Tyler holding the keys. Tyler said he "could kill two birds with one stone" by driving Caroline to her parents' house and by getting Justin to go there so that Tyler could confront him. Pretending to be Caroline, Tyler used her cell phone to send Justin the following message: "Want to meet tonight? I'm feeling better. Husband gone for the night." Justin responded and agreed to meet at Caroline's parents' house.

Before departing for Caroline's parents' house, Tyler searched for a baseball bat. He told Caroline he wanted to "[h]urt Justin real bad" and make him "quadriplegic," so that she could take care of him for the rest of her life if she wanted to do so. Tyler also said, "If I kill him, I kill him." He retrieved a handgun from a safe, loaded it, and then put it in the car along with a baseball bat, a gallon of bleach, a container of Clorox™ wipes, a towel, and a change of clothes (sweatpants and a shirt). Tyler told Caroline the wipes were to clean the blood off the bat. He took the sweatpants because his pants were loose and the sweatpants had a drawstring, and he could change

3

into them so that his pants would not fall down were he to "run up on this guy or sneak on him."

During the drive to Caroline's parents' house, which lasted 20 to 30 minutes, Justin sent Caroline a text message that he would meet her and would tell his girlfriend he was Christmas shopping. Tyler, still pretending to be Caroline, pulled over and responded, "Hey I'm driving. I'll see ya soon." Tyler did not want to give Caroline her phone back "until [he] figure[d] out what's goin' on with [Justin] because she's gonna tip him off."

Tyler and Caroline arrived at her parents' house between 6:00 and 7:00 p.m. on December 22. Caroline and her mother went into a bedroom to discuss Caroline's marital problems. Tyler and Caroline's father stayed in the living room and dining room. Tyler told Caroline's father that she was seeing another man and that he was using her cell phone to lure the other man into a meeting. Tyler also told Caroline's father he had a gun and could end up killing the other man. Through a window, Tyler saw Justin driving up and down the street.

At 7:40 p.m., Justin sent Caroline a text message: "It's been almost two hours. I can't stay out all night." Tyler sent a text message asking, "You here?" to which Justin answered, "Here." Caroline's father tried to persuade Tyler not to confront Justin, and they prayed together that the matter would be resolved without any further injury. Tyler then exited the house.

B.    *Shooting*

Tyler retrieved gloves he kept in his car and put them on because he was "about to hit somebody." He also retrieved the baseball bat and the handgun and tucked the latter into his waistband. Tyler stood next to some bushes and watched Justin drive his car back and forth. When Justin parked his car, Tyler approached from the rear to surprise him. Tyler opened the

4

driver's side door, and Justin gave him a startled look. Tyler then struck Justin's left arm with the bat. Justin uttered an obscenity, reached for something from the visor of the car, and put a leg outside the car. Tyler ran away; and when he looked back, he saw Justin standing outside the car and thought he was holding something. Tyler pulled out his handgun and cocked it. Justin got back into his car and closed the door. Tyler then fired nine shots at Justin's car. Two of them struck Justin, one in the back and the other in the head. The shot to the head was instantly fatal. After killing Justin, Tyler got into his car and drove away.

C.    *Arrest and Charges*

Tyler was arrested at his sister's house the following day. The People charged him with first degree murder. (Pen. Code, § 187, subd. (a); subsequent undesignated section references are to this code.) The People alleged as a special circumstance that Tyler intentionally killed Justin by means of lying in wait (§ 190.2, subd. (a)(15)), and alleged as an enhancement that in committing the murder Tyler personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). He pled not guilty to the murder charge and denied the special circumstance and enhancement allegations.

D.    *Voir Dire*

During questioning of prospective jurors, the prosecutor asked whether they would feel a crime victim was "less deserving of the protections of the law" were they to "hear[ ] evidence that the victim engaged in conduct that they didn't agree with." One juror responded affirmatively. The prosecutor then more specifically asked the prospective jurors whether evidence of a victim's "infidelity" would make them feel the victim was less deserving of the protections of the law or "it maybe should be lesser of a crime." Several

5

jurors responded that infidelity would not cause them to feel that way. Defense counsel did not object to this line of questioning.

The trial court interrupted voir dire to speak to counsel in chambers. The court cautioned the prosecutor that he "need[ed] to be careful" because infidelity can justify a conviction of voluntary manslaughter "if the circumstances are there." The court stated it was important the prosecutor not ask jurors questions that could "precondition [them] to believe that infidelity is not important." The prosecutor said, "Okay" and "I'll move on."

Shortly after the conference in chambers, the prosecutor discussed with prospective jurors the burden of proof and the reasonable doubt standard. The prosecutor stated the court would tell the jurors he did not "have to prove the defendant's guilt beyond any possible doubt, just beyond a reasonable doubt," and asked whether they understood the distinction. The jurors collectively answered, "Yes." To test their understanding, the prosecutor asked whether any juror thought it possible that the prosecutor was a professional basketball player before he became a lawyer. Some prospective jurors responded it was possible, but it was not reasonable based on the prosecutor's age and height and other grounds. The prosecutor told the jurors they had used common sense to distinguish what is possible from what is reasonable. He then told the prospective jurors he had the burden of proof and the defendant was presumed innocent until the prosecutor proved he was guilty beyond a reasonable doubt. The prosecutor asked the jurors whether they could return a guilty verdict if he proved defendant's guilt beyond a reasonable doubt, and they answered affirmatively.

After dismissing the prospective jurors, the trial court warned the prosecutor not to let the basketball example he used in voir dire to illustrate the difference between what is possible and what is reasonable "carry over

6

into [his] closing argument because there's a plethora of case law that talks about . . . trivializing the standard of proof and making it seem like it's a lot simpler concept than it is." The prosecutor said he "appreciate[d] the [c]ourt's counsel" and would be "judicious in [his] word choice during closing."

E.     *Evidence at Trial*

The People put on evidence establishing the facts summarized in parts I.A. and I.B., *ante.*

Tyler testified on his own behalf. He said he "lost it" and "started going crazy" when he found the sexually explicit text messages between Justin and Caroline on her cell phone. Tyler arranged the meeting with Justin because he wanted proof they were having an affair. He did not plan to kill Justin, and took the baseball bat, handgun, and other items to Caroline's parents' house only to convince Caroline he was "a man" and "a warrior" who "would fight for her." When Justin arrived at Caroline's parents' house, Tyler was "scared" because Justin was "a big tough dude" and Tyler is "just a little computer nerd." Tyler felt like he had "backed [him]self into a corner" and had to confront Justin "to tell him [the affair] was over."

When Tyler saw Justin drive by Caroline's parents' house, he left the house, went to his car to get the baseball bat so that he could scare Justin, and took the handgun "[j]ust in case." Upon seeing Justin face-to-face as he sat in his car, Tyler "panicked" and struck Justin's arm with the bat. After uttering an obscenity and saying, "You're dead or something," Justin grabbed something blue from the visor[1] and exited the car. Tyler ran 20 to 30 feet away, and fearing he was going to be shot in the back, turned around, grabbed his handgun, and cocked it. Justin got back into the car and

---

[1]     A blue flashlight was later found on the front passenger seat of Justin's car.

illuminated the brake lights. Tyler thought Justin was going to run him over and began firing at the car to "try[ ] to stop it by shooting the tires or something." He did not intend to hit Justin; he intended only to disable the car to save his own life.

Tyler called two character witnesses, a former girlfriend who knew him since he was 12 years old and a friend who knew him since he was seven years old. Both testified Tyler was never violent and always honest.

F.    *Jury Instructions*

The trial court gave the jury pattern instructions on, among other things, the reasonable doubt standard of proof (CALCRIM No. 220), murder (CALCRIM No. 520), first degree murder on theories of deliberation and premeditation and lying in wait (CALCRIM No. 521), the lying-in-wait special circumstance (CALCRIM No. 728), self-defense (CALCRIM Nos. 505, 3471, 3472), provocation as reducing murder from first to second degree (CALCRIM No. 522), and voluntary manslaughter on theories of heat of passion and imperfect self-defense (CALCRIM Nos. 570, 571).

G.    *Closing Arguments*

The prosecutor argued to the jury that Tyler's killing of Justin was not done in self-defense and was done with malice aforethought, and therefore constituted murder. The prosecutor further argued the murder was of the first degree under two alternative theories: (1) the killing was willful, deliberate, and premeditated; or (2) the killing was done by means of lying in wait.

Defense counsel argued Tyler was not guilty of murder, because he had no intent to kill Justin, did not deliberate or premeditate the killing, did not lay in wait to kill Justin, and acted in self-defense when he shot at Justin's car to prevent Justin from running him over. Counsel also argued that if

8

Tyler was guilty of any type of homicide, it was voluntary manslaughter, either because Caroline's infidelity provoked him to kill Justin in the heat of passion, or because he shot at Justin's car in the actual but unreasonable belief he needed to do so to save his own life.

In rebuttal, the prosecutor described Tyler's self-defense claim as "absurd" and "offensive." The prosecutor argued it "doesn't make sense. It's not reasonable. It's not what happened." Instead, the prosecutor argued, "this is a first-degree murder case. When you use deception, you pretend to be someone else, you lure the victim over to [a location, and] you execute your plan under cover of darkness, you have one goal in mind. And when you have that chance, you shoot every single bullet at your disposal to make sure the job is done." In that scenario, the prosecutor again said the claim of self-defense was "absurd." Defense counsel did not object to the prosecutor's remarks.

H.    *Jury Questions*

During the third and final day of deliberations, the jury sent the trial court two questions. The first concerned the lying-in-wait theory of murder and asked:

> "On page 2 of [CALCRIM No.] 521 it is stated that 'The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.' [¶] Therefore, based on that specific language[,] [i]f a person [lay] in wait briefly with only intent to assault, and murder ended up happening by rash decision in a state of panic, then they did not 'show a state of mind equivalent to deliberation or premeditation' for murder, only for assault. Can you provide any guidance on this?"

After discussing the question and potential responses with the prosecutor and defense counsel, the court responded: "In the event you find [the prosecutor] has not proven beyond a reasonable doubt that [the defendant]

9

committed [first] degree murder under either theory of premed[itation] and deliberation or lying in wait, then see [CALCRIM Nos.] 520, 570 [and] 571 regarding [second] degree murder and both theories of voluntary manslaughter."

The second question concerned deliberation and premeditation and asked: "If the defendant premedit[at]ed an assault and later in the confrontation deliberately killed the victim, does that constitute first degree murder or is it more closely aligned to second degree murder?" After discussing the question and potential responses with the prosecutor and defense counsel, the trial court responded: "I cannot answer this question for you. Please see [CALCRIM Nos.] 520 and 521."

Defense counsel stated he was "good with" both of the trial court's responses to the jury's questions.

I.      *Verdicts and Sentence*

The jury found Tyler guilty of first degree murder and found true the special circumstance and firearm enhancement allegations. The trial court sentenced him to prison for a term of life without the possibility of parole for the murder (§ 190.2, subd. (a)(15)), plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).[2]

---

2      Although the trial court correctly imposed a consecutive prison term on the firearm enhancement when it pronounced judgment at the sentencing hearing, the corresponding minutes incorrectly state the court imposed a concurrent term, and the abstract of judgment suggests the term is concurrent by listing the time imposed as "(25)." We order the minutes corrected to state the prison term for the firearm enhancement is to be served consecutively to the term for the murder conviction, and order the clerk of the trial court to prepare an amended abstract of judgment that states the enhancement is to be served consecutively, not concurrently.

10

## II.

## DISCUSSION

Tyler seeks reversal of the judgment on several grounds. He challenges the sufficiency of the evidence to support the jury's guilty verdict on the first degree murder charge and its true finding on the lying-in-wait special circumstance allegation. Tyler complains the trial court prejudicially erred in instructing the jury on lying in wait. He claims the court abused its discretion in the way it answered questions from the jury about lying in wait and deliberation and premeditation. Tyler alleges the prosecutor's misconduct during voir dire and closing argument deprived him of a fair trial. He faults trial counsel for failing to object to the pattern instruction on the lying-in-wait theory of first degree murder, to the trial court's purportedly inadequate responses to the jury's questions, and to the prosecutor's alleged misconduct. Finally, Tyler contends the cumulative prejudice from the instructional errors, prosecutorial misconduct, and ineffective assistance of counsel made his trial fundamentally unfair. We shall address these claims of error in turn below.

A. *Insufficiency of Evidence*

Tyler contends the verdict finding him guilty of first degree murder deprived him of liberty without due process of law (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 15) because the evidence was insufficient to establish malice aforethought, deliberation and premeditation, or lying in wait. He also contends the jury's true finding on the special circumstance allegation deprived him of liberty without due process of law because the evidence was insufficient to establish a causal relationship between the lying in wait and the killing, an intent to kill during the period of watching and waiting, or a killing by surprise from a position of advantage.

11

1.    *Standard of Review*

In reviewing a due process challenge to the sufficiency of the evidence to support a guilty verdict, we review the record in the light most favorable to the verdict to determine whether it contains substantial evidence (i.e., evidence that is reasonable, credible, and of solid value) from which a reasonable jury could find each element of the charged offense beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Cole* (2004) 33 Cal.4th 1158, 1212.)  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)  "We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity." (*People v. Moore* (2010) 187 Cal.App.4th 937, 940 (*Moore*).)  These same rules apply to a challenge to the sufficiency of the evidence to support a jury's special circumstance finding. (*People v. Powell* (2018) 5 Cal.5th 921, 944.)

2.    *Murder Verdict*

The jury found Tyler guilty of first degree murder.  To be guilty of murder, Tyler must have killed Justin "unlawfully" (i.e., without legal excuse or justification (§§ 195, 197; *People v. Frye* (1992) 7 Cal.App.4th 1148, 1159)) and "with malice aforethought" (§ 187, subd. (a)).  The theories of first degree murder presented to the jury were killing "by means of . . . lying in wait" and "willful, deliberate, and premeditated killing." (§ 189, subd. (a).)  Thus, to support the verdict the record must contain substantial evidence from which the jury reasonably could conclude Tyler acted with malice when he killed Justin and either lay in wait to kill him or willfully killed him with deliberation and premeditation.

### a.    *Malice Aforethought*

Tyler first claims the evidence was insufficient to establish the malice element of murder.  He argues that given the evidence of Caroline's marital infidelity and his anger when he discovered it, no rational jury could have found he did not kill Justin upon adequate provocation and in the heat of passion.[3]  We reject this claim of error.

The malice required for murder may be express or implied.  (§ 188, subd. (a).)  "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature."  (*Id.*, subd. (a)(1).)  "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (*Id.*, subd. (a)(2).)  "This statutory definition of implied malice . . . 'has never proved of much assistance in defining the concept in concrete terms' [citation], and juries should be instructed that malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]."  (*People v. Blakeley* (2000) 23 Cal.4th 82, 87 (*Blakeley*).)[4]  A defendant who unlawfully kills in the "heat of passion" lacks malice and is guilty of voluntary manslaughter.  (§ 192, subd. (a); see *People v. Lasko* (2000) 23 Cal.4th 101, 109-110.)  What distinguishes this

---

[3]    Tyler also asserts in his opening brief that there was insufficient evidence of malice to overcome the "compelling evidence" of imperfect self-defense.  He does not further develop this assertion by discussing the pertinent evidence or citing supportive legal authorities.  We therefore deem the imperfect self-defense point forfeited and do not address it further.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

[4]    The jury was so instructed in this case.  (CALCRIM No. 520.)

13

form of manslaughter from murder is provocation. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225.) " 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*Ibid.*) " ' " '[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " ' " (*Ibid.*)

There was substantial evidence introduced at trial from which the jury reasonably could determine Tyler did not kill Justin in the heat of passion. " '[C]ircumstances such as the transaction of other business in the meantime, rational conversations upon other subjects, [and] evidence of preparation for the killing' " may show cooling of the passions. (*People v. Golsh* (1923) 63 Cal.App. 609, 617.) Such circumstances existed in this case. During the several hours between Tyler's discovery of the sexually explicit text messages between Caroline and Justin and the fatal shooting, Tyler: (1) took Caroline's cell phone, pretended to be her, sent Justin several text messages, and eventually arranged a meeting at her parents' house; (2) prepared for a violent confrontation with Justin by putting into the car a loaded handgun, a baseball bat, and materials to clean up the mess afterwards; (3) drove to Caroline's parents' house, pulling over once along the way to respond to a text message from Justin; and (4) talked to Caroline's father for over an hour about her infidelity and the meeting he had set up with Justin, and prayed with her father just before exiting the house to confront Justin. (See pt. I.A.*, ante.*) From these circumstances, the jury reasonably could infer that "any passions that may have been aroused upon first [discovering the marital

14

infidelity] had cooled so that the killing became an act of revenge or punishment." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704.)

There was other evidence from which the jury reasonably could conclude Tyler killed Justin with express or implied malice. Tyler told Caroline that he was "a lot more capable of evil th[a]n [she] realize[d]" when it came to another man touching her and that he wanted to make Justin quadriplegic, and Tyler acknowledged to both her and her father that he could end up killing Justin. Those statements show awareness of life-endangering conduct and conscious disregard for life sufficient to establish implied malice. (See *Blakeley*, *supra*, 23 Cal.4th at p. 87.) Tyler's firing of nine shots at the car in which he knew Justin was sitting also shows intent to kill or at least awareness of life-endangering conduct and conscious disregard for life. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [defendant's or accomplices' firing multiple gunshots at occupied vehicle established malice]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224-1225 (*Villegas*) [defendant's firing six gunshots at occupied truck from 25 feet away "indicated a clear intent to kill"].)

Ignoring the evidence that supports the jury's implied finding he acted with the malice required for murder, Tyler cites evidence that he was not a violent person and that his discovery of Caroline's infidelity made him "upset, angry, and agitated" to argue his killing of Justin "is a classic case of heat of passion" and no rational juror could have found otherwise. Whether Tyler killed Justin with malice aforethought (and therefore was guilty of murder) or killed him in the heat of passion (and therefore was guilty of voluntary manslaughter) was a factual matter for the jury to decide. (See, e.g., *People v. Wright* (2015) 242 Cal.App.4th 1461, 1482 ["whether adequate provocation and heat of passion have been shown are fundamentally jury questions"].)

15

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.) Because, as we have explained, substantial evidence supports the jury's verdict that Tyler killed Justin with malice and so was guilty of murder, it is no ground for reversal that other evidence, had it been credited by the jury, would have supported a verdict that he killed Justin in the heat of passion and so was guilty of voluntary manslaughter. (See *Moore, supra*, 187 Cal.App.4th at p. 940 ["We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity."].)

In urging us to reach a different conclusion, Tyler discusses four cases in which the jury found the defendant guilty of murder for killing an unfaithful partner or the partner's lover, and the defendant successfully challenged the conviction. None of the cited cases, however, supports reversal or modification of Tyler's murder conviction.

In *People v. Berry* (1976) 18 Cal.3d 509, 515, the defendant testified to "a two-week period of provocatory conduct by his wife . . . that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." The Supreme Court of California held the trial court erred by failing to instruct the jury on voluntary manslaughter based on heat of passion. (*Id.* at p. 518.)

16

Here, the trial court instructed the jury on that theory of homicide (CALCRIM No. 570), and by finding Tyler guilty of murder the jury implicitly rejected it. "We shall not substitute the jury's implied findings with an alternate version, preferred by [Tyler], that the jury considered and rejected." (*People v. Manriquez* (2005) 37 Cal.4th 547, 578.)

In *People v. Borchers* (1958) 50 Cal.2d 321, 326, the defendant shot a woman with whom he was romantically involved after she admitted infidelity, taunted him, and urged him to shoot her. The jury found the defendant guilty of second degree murder, and on the defendant's motion for new trial the trial court modified the verdict to voluntary manslaughter. (*Id.* at p. 323.) In affirming the modification, the Supreme Court of California ruled that "[f]rom the evidence viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of 'passion' by a series of events over a considerable period of time." (*Id.* at pp. 328, 330.) The Supreme Court commended the trial judge "for his diligent alertness to the power and duty, reposed *only in trial courts*, to reappraise the weight of the evidence on motion for new trial." (*Id.* at p. 330; see *People v. Thomas* (1945) 25 Cal.2d 880, 905 ["upon an application to reduce the degree or class of an offense, a trial judge may review the weight of the evidence but an appellate court should consider only its sufficiency as a matter of law" (italics omitted)].) Unlike the trial court in *Borchers*, the trial court here did not modify the verdict against Tyler. And unlike a trial court considering a motion for new trial, an appellate court considering a challenge to the sufficiency of the evidence to support a verdict has no power to reweigh the evidence. (*People v. Ashley* (1963) 59 Cal.2d 339, 366; *Moore, supra,* 187 Cal.App.4th at p. 940.)

17

This case is not like *People v. Bridgehouse* (1956) 47 Cal.2d 406, where our Supreme Court reduced a conviction from second degree murder to voluntary manslaughter. There, the defendant, who happened to be armed as a deputy sheriff, shot his wife's lover when he suffered a severe physical and emotional shock upon unexpectedly finding the lover living in the home of his wife's mother. (*Id.* at pp. 409, 411.) There was no evidence the defendant ever made any threatening remarks to or about the lover or showed any resentment toward him, and "there was no malice shown, either express or implied." (*Id.* at pp. 412, 414.) By contrast, the record in this case contains evidence of threats and malice. Tyler told Caroline he wanted to make Justin quadriplegic, and told her and her father he could end up killing him. Tyler, under false pretenses, lured Justin to Caroline's parents' house, where, armed with a baseball bat and a loaded handgun, he sneaked up on Justin, hit him with the bat, and then fired nine shots at the car Justin occupied. On this record we cannot conclude, as could the Supreme Court on the record in *Bridgehouse*, "that the evidence is legally insufficient to support a judgment of [first] degree murder but that it is legally sufficient to support a judgment of manslaughter." (*Id.* at p. 414.)

The final case Tyler cites, *People v. Le* (2007) 158 Cal.App.4th 516, concerned a claim of instructional error. In that case, the defendant fatally stabbed his wife's lover after an argument with the wife in which she insulted the defendant by suggesting he suck her lover's penis. (*Id.* at pp. 518-522.) The trial court instructed the jury on voluntary manslaughter based on heat of passion, and also instructed the jury that words, no matter how offensive, could not justify an assault or battery (CALCRIM No. 917). (*Le*, at pp. 523-524.) The Court of Appeal held that because the provocation that incites a defendant to kill in the heat of passion may be verbal, it was error to give

18

CALCRIM No. 917 and to permit the prosecutor to argue its application in determining provocation. (*Le*, at pp. 528, 529.) Because the wife's insult might have "served as the spark that caused [a] powder keg of accumulated provocation to explode," the Court of Appeal held that in the absence of the instructional error it was reasonably probable there would have been a verdict more favorable to the defendant, and reversed the judgment convicting him of second degree murder. (*Id.* at pp. 529, 532.) No similar instructional error occurred in the case against Tyler. The trial court instructed the jury provocation may reduce murder to manslaughter (CALCRIM No. 522), and to do so no specific type of provocation was required (CALCRIM No. 570). *Le* is thus not on point.

In sum, the People presented legally sufficient evidence from which the jury reasonably could conclude Tyler killed Justin with malice aforethought and not in the heat of passion. We therefore may not upset the jury's verdict finding him guilty of murder.

b. *Willfulness, Deliberation, and Premeditation*

Tyler next claims the evidence was insufficient to establish the deliberation and premeditation needed to make the murder first degree. (See § 189, subd. (a).) He contends the evidence showed he planned only to assault Justin and ended up killing him in a state of panic. We are not persuaded.

A verdict of willful, deliberate, and premeditated murder requires evidence that the defendant carefully weighed considerations in forming the course of action that led to the killing and thought things over in advance. (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*); *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).) "The type of evidence which [the Supreme Court of California] has found sufficient to sustain a finding of premeditation

19

and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*); accord, *People v. Morales* (2020) 10 Cal.5th 76, 88-89.) The *Anderson* "guidelines are descriptive and neither normative nor exhaustive, and . . . reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Evidence of all three *Anderson* categories was presented at trial. Planning activity included pretending to be Caroline for several hours and sending text messages from her cell phone to Justin to arrange a meeting at her parents' house, and then taking to the meeting a baseball bat, a loaded handgun, a change of clothes, and materials to clean up afterwards. (*Anderson*, *supra*, 70 Cal.2d at p. 26 ["activity directed toward, and explicable as intended to result in, the killing" supports finding of deliberation and premeditation].) After discovering hundreds of sexually explicit text

20

messages between Caroline and Justin over 90 days, Tyler had a motive to kill Justin, namely, to eliminate a threat to his marriage to Caroline. (*Id.* at p. 27 [facts about relationship between defendant and victim suggesting motive to kill support finding of deliberation and premeditation]; *People v. Banos* (2009) 178 Cal.App.4th 483, 486 ["retribution for infidelity" may constitute motive for killing].) The manner of the killing, which involved a sudden attack on an unsuspecting victim, the use of two weapons, and the firing of nine shots, also supports the conclusion the killing was willful, deliberate, and premeditated. (*Anderson*, at p. 27 [facts indicating preconceived design to kill victim in particular way support finding of deliberation and premeditation]; *Villegas*, *supra*, 92 Cal.App.4th at pp. 1224-1225 [firing six shots at occupied truck from distance of 25 feet indicated premeditation and deliberation].)

Tyler argues the jury's questions on whether he deliberated or premeditated for purposes of first degree murder if he intended only to assault Justin but ended up killing him in a state of panic show there was insufficient evidence he decided to kill after carefully weighing the considerations for and against killing. We disagree. The jury's questions indicate only that during deliberations it had some uncertainty about whether Tyler had the mental state required for first degree murder. In response to those questions, the trial court referred the jury to the instructions that define the required mental state. (CALCRIM Nos. 520, 521.) In the absence of a record to the contrary, we presume the jury followed those instructions, evaluated the evidence in light of those instructions, and by returning a verdict of guilty of first degree murder concluded the People had proved deliberation and premeditation beyond a reasonable doubt.

21

(*People v. Fayed* (2020) 9 Cal.5th 147, 192; *People v. Cortes* (2022) 75 Cal.App.5th 198, 205-206.)

        c.     *Lying in Wait*

Tyler also challenges the sufficiency of the evidence to establish the lying in wait required for first degree murder. We need not and do not separately address this challenge, however. Where, as here, a jury is instructed on two theories of first degree murder, a guilty verdict will be upheld if sufficient evidence supports one of the theories. (*People v. Lewis* (2008) 43 Cal.4th 415, 507.) "We need not decide whether there was sufficient evidence of murder by means of lying in wait because we [have] conclude[d] there was sufficient evidence of premeditation and deliberation." (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.) Furthermore, if substantial evidence supports the jury's true finding on the lying-in-wait special circumstance allegation, as we conclude it does in the next section, "it necessarily supports the theory of first degree lying-in-wait murder." (*People v. Flinner* (2020) 10 Cal.5th 686, 748 (*Flinner*).)

        3.     *Special Circumstance Finding*

We now turn to Tyler's claim the evidence was insufficient to support the jury's true finding on the special circumstance allegation that he killed Justin by means of lying in wait. Tyler contends, "[N]o rational juror could have found proof beyond a reasonable doubt of the required causal relationship, immediacy, or intent during a substantial period of watching and waiting." We disagree.

The special circumstance applies when "[t]he defendant intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) It requires (1) an intentional murder committed under circumstances that include (2) a concealment of purpose, (3) a substantial period of watching and

22

waiting for an opportune time to strike, and (4) a surprise attack on an unsuspecting victim from an advantageous position. (*People v. Parker* (2022) 13 Cal.5th 1, 58; *People v. Johnson* (2016) 62 Cal.4th 600, 629 (*Johnson*).) Sufficient evidence of each element was introduced at trial.

From Tyler's statements to Caroline and her father that he wanted to render Justin quadriplegic and could end up killing him and from Tyler's firing of nine shots at the car in which he knew Justin was sitting, the jury reasonably could infer Tyler harbored an intent to kill. (See *People v. Campos* (2007) 156 Cal.App.4th 1228, 1244 [firing multiple gunshots at occupied vehicle from close range supports inference of intent to kill]; *Villegas*, *supra*, 92 Cal.App.4th at pp. 1224-1225 [firing six shots at car from distance of about 25 feet indicated clear intent to kill]; *People v. Martinez* (1987) 193 Cal.App.3d 364, 370-371 [defendant's prior threats to kill or harm victim supported inference of intent to kill].)

Concealment of purpose was shown by Tyler's pretending to be Caroline in text messages with Justin to lure him to her parents' house under the pretext of meeting her for sexual relations. (See *People v. Mataele* (2022) 13 Cal.5th 372, 421 [use of ruse to lure victim to location of killing shows concealment of purpose]; *People v. Combs* (2004) 34 Cal.4th 821, 853 [same].)

The evidence showed Tyler waited in Caroline's parents' house for Justin to arrive; watched him drive up and down the street from inside the house; went outside, retrieved weapons, and stood next to some bushes while he continued to watch Justin drive up and down the street; and then attacked Justin from behind after he parked his car. Although the evidence did not establish the exact amount of time Tyler watched and waited before killing Justin, "[t]he precise period of time is . . . not critical." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1145.) Caroline's parents heard gunshots three to five

23

minutes after Tyler exited the house. A period of a few minutes allows for premeditation or deliberation and suffices to overcome any inference Tyler acted as a result of a rash impulse. (*People v. Cage* (2015) 62 Cal.4th 256, 279; *People v. Stevens* (2007) 41 Cal.4th 182, 203.)

Statements Tyler made to police during an interview showed he launched a surprise attack on Justin from a position of advantage. Tyler told the interviewer he planned to "sneak [up] on [Justin]" and "suddenly . . . run up on him, you know, with a bat and . . . kinda scare him." Tyler said he "ha[d] to surprise [Justin]" and approached his car from the rear. Tyler also told the interviewer that when he opened the driver's side door of Justin's car, Justin looked "startled" and Tyler "[d]efinitely caught him off guard" and "surprised him." Tyler said he then hit Justin with the bat; retreated when Justin got out of the car; and "unloaded on the back of his car" after Justin got back inside. These statements were sufficient to establish the fourth element of the lying-in-wait special circumstance. (See *Johnson*, *supra*, 62 Cal.4th at p. 631 [luring victim to location under false pretenses and approaching and shooting victim from behind showed surprise attack from position of advantage].)

Tyler insists, however, that he did not kill Justin by surprise from a position of advantage, because the surprise and advantage that existed when Tyler opened Justin's car door and struck him with the bat no longer existed when, "[m]oments later," Tyler faced Justin and pulled out his handgun. In other words, Tyler argues, Justin's "prior surprise did not cause the unsurprising killing to be committed by means of lying in wait." In so arguing, Tyler cites cases that considered a prior version of the lying-in-wait special circumstance, which required proof the defendant killed the victim *while* lying in wait, i.e., during the period of concealment and watchful

24

waiting.  (See *People v. Nieves* (2021) 11 Cal.5th 404, 465 [prior version of special circumstance was not proved if there was clear interruption between period of lying in wait and killing such that there was neither immediate killing nor continuous sequence of lethal events]; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1183-1185 [insufficient evidence to support prior version of special circumstance when series of nonlethal events intervened between period of watchful waiting and killing].)  The statute defining the special circumstance was amended in 2000, however, to require proof the defendant killed the victim *by means of* lying in wait "to essentially eliminate the immediacy requirement that case law had placed on the special circumstance."  (*People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 307.)  As we explained above, the evidence at trial established each of the elements required by the current version of the lying-in-wait special circumstance.  (See § 190.2, subd. (a)(15); *Johnson*, *supra*, 62 Cal.4th at p. 629.)

B.    *Instructional Error*

Tyler raises two claims of instructional error, one concerning the instructions on lying in wait and the other concerning the trial court's responses to jury questions about the theories of first degree murder.  We consider and reject the claims in turn below.

1.    *Instruction on Lying-in-Wait Murder*

Tyler contends the trial court should not have instructed the jury on lying in wait as a theory of first degree murder or as a special circumstance because the evidence was insufficient to establish he killed Justin by means

of lying in wait. Tyler also contends the instruction the court gave on lying in wait as a theory of murder omitted an essential element.[5] We disagree.

The evidence was sufficient to warrant instructing the jury on lying in wait as a theory of first degree murder and as a special circumstance. We have already explained sufficient evidence supports the jury's true finding on the special circumstance allegation that Tyler killed Justin by means of lying in wait. (See pt. II.A.3., *ante*.) That same evidence "necessarily supports the theory of first degree lying-in-wait murder." (*Flinner*, *supra*, 10 Cal.5th at p. 748; accord, *Johnson*, *supra*, 62 Cal.4th at pp. 633-634.)

The instruction the trial court gave the jury (CALCRIM No. 521) did not omit an element of lying-in-wait murder. We review the legal adequacy of jury instructions de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210; *People v. Sandoval* (2020) 50 Cal.App.5th 357, 361.) The element Tyler contends was omitted, namely, that while he was watching and waiting he had a wanton and reckless intent to inflict injury likely to cause death, is not a required element of murder by means of lying in wait. Although the lying-in-wait special circumstance requires an intent to kill, "murder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death." (*People v. Webster* (1991) 54 Cal.3d 411, 448; accord, *Flinner*, *supra*, 10 Cal.5th at p. 748.) The defendant must have the required mental state *at the time of the killing*. (§§ 20 [crime requires union of act and intent], 187, subd. (a) [murder is killing "with malice aforethought"]; *People v. Concha* (2009) 47 Cal.4th 653, 660 [murder requires commission of fatal act by person

---

[5] We reject the People's argument Tyler forfeited this contention by failing to object to or request a modification of the instruction at trial. "Instructional error as to the elements of an offense is not waived by trial counsel's failure to object." (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.)

acting with malice aforethought].)  But the defendant need *not* have that mental state *during the period of watching and waiting*.  "[N]othing in section 189 requires the lying in wait to have been done with the intent to kill . . . [or] the intent to injure." (*People v. Laws* (1993) 12 Cal.App.4th 786, 794.)  "All that is required of lying in wait is that the perpetrator exhibit a state of mind equivalent to, but not identical to, premeditation and deliberation.  [Citation.]  This state of mind simply is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in order to facilitate the act which constitutes murder.  [Citation.]  It does not include the intent to kill or injure the victim." (*Id.* at p. 795.)  The trial court thus did not omit an element of lying-in-wait murder.

2.      *Responses to Jury Questions*

Tyler complains the trial court violated his due process right to a fair trial when it inadequately responded to questions from the jury about lying in wait, deliberation, and premeditation.  He argues the court should have answered the questions directly and not merely directed the jury to instructions it had already given.  He further argues that had the court directly answered the questions, a rational juror could have had a reasonable doubt about Tyler's guilt of first degree murder, and therefore reversal of the judgment is required.  We are not persuaded.[6]

As part of its duty to instruct the jury on the law applicable to the case, if during deliberations the jury has a question about that law, the trial court

---

6      We acknowledge the People's contention Tyler forfeited this claim of error because his counsel said he was "good with" the trial court's responses to the jury's questions.  (See, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 877.)  Because Tyler complains such acquiescence constituted ineffective assistance of counsel, we elect to address the claim on the merits.  (See, e.g., *People v. Lua* (2017) 10 Cal.App.5th 1004, 1016, fn. 12 (*Lua*).)

must provide information needed to clear up any confusion the jury may have. (§ 1138; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) The court has discretion in deciding how to answer the jury's question. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*); *People v. Giardino* (2000) 82 Cal.App.4th 454, 465.) We review the trial court's decision on how it can best aid the jury for abuse of discretion, and reverse only if the decision exceeded the bounds of reason and resulted in a miscarriage of justice. (*People v. Waidla* (2000) 22 Cal.4th 690, 714, 745-746; *People v. Roberts* (1992) 2 Cal.4th 271, 326; *Giardino*, at p. 465.)

The trial court adequately discharged its duty under section 1138 in responding to the jury's question about the lying-in-wait theory of first degree murder. In its note to the court, the jury referenced the language of the instruction that the period of the lying in wait "must be substantial enough to show a state of mind equivalent to deliberation or premeditation" (CALCRIM No. 521), and then asked for "guidance" on whether a defendant who lay in wait "briefly with only intent to assault" but killed "by rash decision in a state of panic" had the state of mind required for lying-in-wait murder. Tyler correctly interprets the jury's question as asking "whether [he] could be convicted of first-degree murder based on lying in wait if his intent during the period of lying in wait was only to assault [Justin]," but incorrectly asserts the court should have answered simply " 'no.' "

As we explained earlier, lying-in-wait murder does not require the defendant have an intent to kill or an intent to injure the victim during the period of watching and waiting. (See pt. II.B.1., *ante*.) The trial court thus would have erred had it told the jury Tyler could not be convicted of first degree murder if he intended only to assault Justin while he (Tyler) lay in wait. Rather, because the jury's question indicated uncertainty about

28

whether the prosecutor had proved the mental state required for first degree murder, the trial court properly advised the jury that if it found the prosecutor had not proved beyond a reasonable doubt that Tyler committed first degree murder under either theory presented, then it should consider the instructions on the lesser offenses of second degree murder and voluntary manslaughter (CALCRIM Nos. 520, 570, 571).  The instructions referenced by the jury in its question and by the court in its response adequately set out the different mental states required for murder and manslaughter.  A trial court need not "always elaborate on the standard instruction" (*Beardslee*, *supra*, 53 Cal.3d at p. 97), and acts within its discretion when, as in this case, "it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete' " (*Lua*, *supra*, 10 Cal.App.5th at p. 1017).

The trial court also adequately performed its instructional duty in responding to the jury's question about deliberation and premeditation.  The jury asked, "If the defendant premedit[at]ed an assault and later in the confrontation deliberately killed the victim, does that constitute first degree murder or is it more closely aligned to second degree murder?"  Tyler reads the question as asking "whether [he] could be convicted of first-degree murder based on deliberation and premeditation if he only premeditated an assault, not a murder," and contends the correct answer for the court to have given was " 'no.' "  The question and answer are not that simple, however.

The jury appears to have been uncertain whether Tyler would be guilty of first or second degree murder if before the attack he had decided to attack Justin to scare him and then during the attack decided to kill him instead. (See *Potts*, *supra*, 6 Cal.5th at p. 1027 [defining deliberation and premeditation]; *Koontz*, *supra*, 27 Cal.4th at p. 1080 [same].)  Because " '[t]he

29

process of premeditation and deliberation does not require any extended period of time' " and " ' "cold, calculated judgment may be arrived at quickly" ' " (*Koontz*, at p. 1080), a defendant who initially planned to assault the victim could quickly have changed his mind during the assault and decided to kill instead. Telling the jury whether, on the hypothetical facts presented in its question, the murder was first degree or second degree thus risked giving the jury inaccurate information and invading its province to decide what the facts were and which homicide offense, if any, Tyler had committed. (See § 1127 ["jurors are the exclusive judges of all questions of fact submitted to them"]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [trial court may not "expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power"]; *People v. Stanhope* (1940) 37 Cal.App.2d 631, 636 [trial court properly told jury it " 'cannot determine the facts for you' "].) Instead of taking those risks, the trial court acted within its discretion by directing the jury to the instructions defining deliberation and premeditation and the different degrees of murder (CALCRIM Nos. 520, 521). (*Beardslee*, *supra*, 53 Cal.3d at p. 87; *Lua*, *supra*, 10 Cal.App.5th at p. 1017.)

C.      *Prosecutorial Misconduct*

Tyler next claims the prosecutor committed misconduct that deprived him of his due process right to a fair trial. Specifically, he contends that during jury selection "the prosecutor attempted to indoctrinate and precondition the jurors to a particular result – conviction of first-degree murder – by asking whether they would feel [Justin] was less deserving of the protection of the law or whether it was 'lesser of a crime' if [he] was involved in infidelity." Tyler also contends the prosecutor misstated the law and lowered the burden of proof because the professional basketball player example he used to illustrate the distinction between what is possible and

what is reasonable "improperly conflated the reasonable-doubt standard with the concept of rejecting unreasonable inferences, and improperly suggested the jury's decision was akin to ordinary, every-day decisions." We reject this claim of error.

Tyler forfeited the claim. He admits in his opening brief that trial counsel did not object to the prosecutor's remarks. Without timely and specific objections to the alleged misconduct at trial, a claim of prosecutorial misconduct is not preserved for appeal. (*People v. Peoples* (2016) 62 Cal.4th 718, 797; *People v. Hillhouse* (2002) 27 Cal.4th 469, 501.) "The reason for this rule" is "that the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." (*People v. Simon* (1927) 80 Cal.App. 675, 679; accord, *People v. Seumanu* (2015) 61 Cal.4th 1293, 1341.) Having deprived the trial court of an opportunity to remedy any misconduct, Tyler may not now assert the misconduct as a basis for reversal.

Even if Tyler had not forfeited the claim, we would reject it. It is misconduct for a prosecutor to ask during voir dire "any question that, *as its dominant purpose*, attempts to precondition the prospective jurors to a particular result or indoctrinate the jury." (Code Civ. Proc., § 223, subd. (b)(3), italics added; see *People v. Castillo* (2008) 168 Cal.App.4th 364, 386.) The prosecutor did not engage in such misconduct by asking the prospective jurors whether they felt the victim's involvement in marital infidelity would make him less deserving of legal protection or a crime against him less serious. Before asking those questions, the prosecutor showed the jury a statue of Lady Justice and asked why she was blindfolded. All agreed it was because she does not prejudge anything and uses what is placed on the scales in her left hand to make her decision. The prosecutor next told the jurors

31

they would hear evidence the victim had made "choices" with which some might not agree and would be asked to decide the case based on the evidence presented. Right after this exchange, the prosecutor asked the jurors more specifically whether learning the victim had participated in infidelity would "make [them] feel that he's less deserving of the law's protection" or that any crime against him "should be lesser of a crime." Read as a whole, this line of questioning shows the prosecutor was trying to find out whether any prospective jurors might feel Justin got what he deserved for having an affair with Tyler's wife. Discovering bias against the victim is a permissible purpose of voir dire. (Code Civ. Proc., § 223, subd. (b)(1) ["the trial judge shall permit liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the particular case or the parties before the court"]; *People v. Mello* (2002) 97 Cal.App.4th 511, 518 ["main object of voir dire" is to " 'ferret[ ] out bias and prejudice on the part of prospective jurors' "].)

Tyler attributes a different, more sinister motive to the prosecutor's questioning, namely, to precondition jurors to find him guilty of first degree murder rather than voluntary manslaughter based on the heat of passion provoked by Caroline's infidelity. We, however, cannot assume the prospective jurors " 'drew the most damaging rather than the least damaging meaning from the prosecutor's statements' " (*People v. Dykes* (2009) 46 Cal.4th 731, 772); and, given the context of the statements and subsequent events, Tyler has not shown it is reasonably likely the jurors " 'construed or applied any of the complained-of remarks in an objectionable fashion' " (*People v. Thomas* (2012) 53 Cal.4th 771, 797 (*Thomas*)). Immediately after the prosecutor questioned the prospective jurors on their feelings about the victim's involvement in marital infidelity, the trial court told the prosecutor

32

evidence of infidelity could support a conviction of voluntary manslaughter, and warned him not to "push this envelope too far and precondition these folks to believe that infidelity is not important." During the rest of voir dire, the prosecutor made no further mention of the victim's participation in infidelity. Later at trial, evidence of Caroline's infidelity with Justin was introduced, Tyler's counsel argued that infidelity provoked Tyler to kill Justin in the heat of passion, and the trial court instructed the jury on provocation and heat of passion. On this record, it is unlikely the jurors took the prosecutor's questioning in voir dire to mean marital infidelity can never constitute legally adequate provocation for homicide and they should find Tyler guilty of first degree murder rather than second degree murder or voluntary manslaughter. (*Ibid.* [misconduct during voir dire is unlikely to influence jury's verdict unduly because misconduct before presentation of evidence or argument occurs at much less critical phase of proceedings].) Tyler thus has not shown the questioning constituted prejudicial misconduct.

Nor has Tyler shown the prosecutor committed misconduct by diminishing the reasonable doubt standard of proof. The prosecutor has the burden to prove the defendant's guilt of the charged offense beyond a reasonable doubt (§ 1096;[7] *In re Winship* (1970) 397 U.S. 358, 364; *People v.*

---

[7] "Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (§ 1096.) The pattern instruction the trial court gave the jury closely tracked the statutory language: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." (CALCRIM No. 220.)

*Carnine* (1953) 41 Cal.2d 384, 392), and it is improper " 'to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements' " (*People v. Hill* (1998) 17 Cal.4th 800, 829). "Prosecutors should avoid drawing comparisons that risk confusing or trivializing the reasonable doubt standard." (*People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*).) In the cases Tyler cites, such misconduct occurred when the prosecutor (1) "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt" and "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence" (*People v. Centeno* (2014) 60 Cal.4th 659, 673 (*Centeno*); see *People v. Meneses* (2019) 41 Cal.App.5th 63, 73 [misconduct to tell jury: " 'You must reject any unreasonable interpretation. And if there's one reasonable interpretation, you must convict.' "]); (2) persistently argued "the beyond-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable" (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 (*Ellison*)); or (3) "suggest[ed] the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry" (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36). Nothing similar happened in this case.

During voir dire, the prosecutor tested the prospective jurors' understanding of the difference between possible doubt and reasonable doubt by asking them whether they believed he had played basketball professionally before he became a lawyer. (See pt. I.D., *ante.*) The prosecutor did not state the jurors could return a verdict of guilty as long as he presented a reasonable account of the evidence (*Centeno*, *supra*, 60 Cal.4th at

---

This instruction "adequately explains the applicable law." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

p. 673) or could return a verdict of not guilty only if it was reasonable to believe Tyler was innocent (*Ellison*, *supra*, 196 Cal.App.4th at p. 1353). The prosecutor merely used an example of something that was possible but was not reasonably likely, namely, that he had a prior career as a professional basketball player, to illustrate the concept of reasonable doubt. "In contrast to some other cases, the prosecutor here did not attempt to quantify reasonable doubt or analogize it to everyday decisions like whether to change lanes in traffic. [Citation.] He gave jurors an example of a possible or imaginary, but unlikely, occurrence. The statute defining the burden of proof expressly states that a 'reasonable' doubt is not a mere ' "possible" ' or ' "imaginary" ' doubt. [Citations.] The prosecutor's [questioning] did not undermine this standard." (*Bell*, *supra*, 7 Cal.5th at pp. 111-112.)

Moreover, having been cautioned against doing so by the trial court, the prosecutor did not use the professional basketball example in closing argument. As we noted earlier, the voir dire questioning occurred before the presentation of evidence or the giving of formal instructions and so was "far less likely to have prejudiced the defendant." (*People v. Medina* (1995) 11 Cal.4th 694, 745; accord, *Thomas*, *supra*, 53 Cal.4th at p. 797.) After the close of evidence, the jury "was given the standard instruction on the presumption of innocence, reasonable doubt, and the prosecutor's burden of proof. [(CALCRIM No. 220).] The language of the foregoing instruction was sufficient both to explain to the jury the prosecution's burden of proof and to dilute any confusion or uncertainty that may have been created by the prosecutor's voir dire [questioning]." (*Medina,* at p. 745.) The prosecutor did not, as Tyler erroneously contends, further undermine the reasonable doubt standard when in rebuttal argument he described Tyler's claim of self-defense as "absurd "and "not reasonable." "It is permissible to argue that the

jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Centeno*, *supra,* 60 Cal.4th at p. 672; see *People v. Romero* (2008) 44 Cal.4th 386, 416 [prosecutor may urge jury "to 'decide what is reasonable to believe versus unreasonable' " and to " 'accept the reasonable and reject the unreasonable' "].) The prosecutor "can surely point out that interpretations proffered by the defense are neither reasonable nor credible." (*Centeno*, at p. 673.) "Nothing in the prosecutor's [rebuttal argument] lessened the prosecution's burden of proof." (*Romero*, at p. 416.)

D.     *Ineffective Assistance of Counsel*

Tyler recasts his claims of instructional error and prosecutorial misconduct as a claim of ineffective assistance of counsel. He complains trial counsel's failures to object to the trial court's instruction on the lying-in-wait theory of murder, to the court's responses to the jury's questions about that theory and about deliberation and premeditation, and to the prosecutor's misconduct during jury selection and closing argument deprived him of the effective assistance of counsel guaranteed by the federal and state Constitutions. (See U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) Because we have concluded there was neither instructional error nor prosecutorial misconduct, Tyler's "related claims of ineffective assistance of counsel fail and do not require further discussion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748; see *People v. Boyette* (2002) 29 Cal.4th 381, 437 ["defense counsel cannot be considered ineffective for failing to make groundless objections or for failing to make objections to misconduct causing defendant no harm"].)

36

E.    *Cumulative Prejudice*

As a final ground for reversal, Tyler contends the cumulative effect of the instructional errors, prosecutorial misconduct, and ineffective assistance of counsel rendered the trial "fundamentally unfair." "The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal." (*People v. Mani* (2022) 74 Cal.App.5th 343, 378.) "A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) "We have found no error, so no prejudice can accumulate." (*People v. Vargas* (2020) 9 Cal.5th 793, 839.)

III.

DISPOSITION

The judgment is affirmed. The clerk of the trial court is directed to correct the minutes of the sentencing hearing held on September 3, 2021, to state that the prison term of 25 years to life imposed on the firearm enhancement is to be served consecutively to the term of life without the possibility of parole imposed on the murder conviction, to prepare an amended abstract of judgment that indicates the term imposed on the enhancement is a consecutive one, and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.


IRION, J.

I CONCUR:



HUFFMAN, Acting P. J.

37

Dato, J., Concurring and Dissenting.

I concur in the result reached by the majority opinion and in its analysis of most of the issues. I respectfully disagree, however, with its conclusion that there was no instructional error in this case. In my view, the standard CALCRIM instruction on first degree murder (No. 521) fails to correctly set forth the mental state required to establish that crime on a lying-in-wait theory, as recently confirmed and explained by the Supreme Court in *People v. Brown* (2023) 14 Cal.5th 453 (*Brown*). The trial court's response to a jury question on the subject, merely referring jurors back to the standard instructions, only compounded the error.

An instructional error of this nature, punctuated by a jury question on the same topic, would normally require reversal. Here, however, the jury's verdict on a related issue as to which it was properly instructed satisfies me the jurors ultimately made factual determinations that rendered the instructional error necessarily harmless.

I

Our disagreement in this case boils down to the correctness of one point in a single decision—*People v. Laws* (1993) 12 Cal.App.4th 786 (*Laws*). According to *Laws,* "nothing in [Penal Code[1]] section 189[ ] requires the lying in wait to have been done with the intent to kill . . . [or] injure." (*Laws,* at p. 794.) Rather, the defendant's culpable state of mind while lying in wait is merely "the intent to watch and wait for the purpose of gaining advantage and taking the victim unaware in order to facilitate the act which constitutes murder. [Citation.] It does not include the intent to kill or injure the victim." (*Id.* at p. 795.) The majority opinion relies on this discussion in *Laws* to

_____

1      All statutory references are to the Penal Code.

reject both of Tyler's instructional error arguments—his challenge to the standard CALCRIM No. 521 instruction on lying-in-wait first degree murder as well as his complaint about how the trial court responded to jury questions. (Maj. opn., *ante,* at pp. 27, 28.)

To put it in a concrete context, assume the defendant waits for the victim, his only intent being to force a verbal confrontation he knows the victim is trying to avoid. Ten minutes later, during the ensuing argument and without premeditation, the defendant develops the mental state necessary for malice and kills the victim. *Laws* means this would be first degree murder by means of lying in wait even though (1) as he waited for the victim, the defendant did not intend to injure him, and (2) the identical killing, without the waiting, would at most be second degree murder.

## II

The critical legal question can be simply stated—what culpable mental state must the defendant have *while lying in wait* to be guilty of first degree murder on a lying-in-wait theory? In my view, the Supreme Court has already answered this question on several occasions, and the answer it has given is quite different from the one that *Laws* offers or the nonanswer that CALCRIM No. 521 provides.

Let's start with the high court's most recent pronouncement just a few months ago. In *Brown,* the court considered a claim of instructional error by a defendant charged with first degree murder by poison. In particular, the court was asked to decide whether "the trial court erred in failing to instruct on the mental state required for first degree poison murder." (*Brown, supra,* 14 Cal.5th at p. 460.) In other words, the issue in *Brown* was identical to the contention raised by Tyler in this case with respect to first degree lying-in-wait murder.

2

To resolve this question, Justice Groban's opinion began by examining the language of section 189 "in its historical context," noting "the designation of murders by means of poison, lying in wait, and torture as kinds of first degree premeditated murder." (*Brown, supra,* 14 Cal.5th at pp. 461–462.) This historical context "reveal[ed] the Legislature's intent to require proof of 'something more' than malice to elevate a murder by means of torture, lying in wait, or poison to the first degree." (*Id.* at pp. 463–464.) That "something more" is the defendant's mental state (mens rea) while committing the acts (actus reus) that constitute lying in wait.

Because the court had "never been asked to directly address what mental state *in the administration of poison* is required to elevate a poison murder to the first degree" (*Brown, supra,* 14 Cal.5th at p. 464, italics added), the opinion surveyed cases considering this same question "in the contexts of murder by torture and by lying in wait — the two other kinds of 'willful, deliberate, and premeditated killing' that section 189 has listed as categorically 'murder of the first degree' since its enactment." (*Brown,* at p. 464.) "In both contexts," said Justice Groban, "we have concluded that more than malice is required; the defendant must have committed the designated act with a *specific mental state* that is equivalent to willfulness, deliberation, and premeditation." (*Ibid.,* italics added.) The court then reiterated that the "act" of lying in wait—an act preceding and distinct from the act of killing—must be accompanied by a specific mental state. " '[I]t is not sufficient to merely show the elements of waiting, watching and concealment. It must also be shown that the defendant did those physical

3

acts with [a specific] intent.' "[2] (*Brown,* at p. 465, quoting *People v. Mattison* (1971) 4 Cal.3d 177, 183.)

Just as the "designated act" in murder by poison is the administration of the poison, in murder by lying in wait it is the lying in wait. And so *Brown*'s discussion of the required mental state addresses the precise question we confront in this case—what must the defendant's mental state be *while* he is lying in wait?

*Brown* holds that in evaluating a charge of first degree murder by poison, the jury should have been instructed it could not find the defendant guilty unless it concluded that she administered the poison "with the intent to kill [the victim] or inflict injury likely to cause . . . death." (*Brown, supra,* 14 Cal.5th at p. 472.) *Brown* similarly tells us that for murder by lying in wait, the defendant must lie in wait, planning to attack the victim with at least a " ' "wanton and reckless intent to inflict injury likely to cause death." ' " (*Id.* at p. 465, quoting *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148 (*Gutierrez*).) As is the case in first degree murder by poison, the jury has to be told about the additional mental state that must accompany the act which makes the killing a murder of the first degree. To be convicted, the defendant while lying in wait must intend that his planned attack will inflict an injury on the victim, and he must also at a minimum consciously disregard the likelihood that the injury will cause death.

Although framed in terms of a discussion of a killing by poison, *Brown*'s summary paragraphs apply equally to this case and provide a comprehensive answer to our simple question: "A killing by [lying in wait] may support a

---

[2]     *Brown* cites *Laws, supra,* 12 Cal.App.4th at page 795, but not for the point the majority opinion relies on. (*Brown, supra,* 14 Cal.5th at pp. 465, 466.)

finding of a second degree murder, a first degree murder, or a special circumstance.  The distinguishing factor is the defendant's mental state." (*Brown, supra,* 14 Cal.5th at p. 471.)  Like a murder by torture or poison, a murder by means of lying in wait "is first degree murder when evidence of how the defendant carried out the [lying in wait] demonstrates a mental state that is 'the functional equivalent of proof of premeditation, deliberation and intent to kill.' " (*Ibid.*, quoting *People v. Ruiz* (1988) 44 Cal.3d 589, 614.) Lying in wait, standing alone, "does not fulfill this requirement unless it is carried out with a state of mind more culpable than the malice required for a second degree murder conviction, i.e., more culpable than either (a) intending to kill the victim without premeditation and deliberation (i.e., express malice), or (b) intentionally [engaging in conduct] knowing that doing so was dangerous to human life and with conscious disregard for human life (i.e., implied malice)." (*Brown,* at p. 471.)  "While no separate showing of premeditated intent to kill is required for first degree murder by [lying in wait] [citation], the [lying in wait] nevertheless must be carried out with a mental state more culpable than malice." (*Ibid.*)  That aggravated mental state—the functional equivalent of premeditation and deliberation— is the " ' "wanton and reckless intent to inflict injury likely to cause death." ' " (*Brown*, at p. 465.)

III

Although the court in *Laws* did not have the benefit of *Brown'*s discussion of the mental state necessary for lying in wait first degree murder, Justice Groban's opinion makes clear that the "heightened mental state" required for conviction is nothing new. (*Brown, supra,* 14 Cal.5th at p. 472.) In declaring that "the defendant must act with a ' "wanton and reckless intent to inflict injury likely to cause death," ' " the Supreme Court quoted its

5

earlier decision in *Gutierrez, supra,* 28 Cal.4th at page 1148, which in turn quoted *People v. Webster* (1991) 54 Cal.3d 411, 448.  (*Brown,* at p. 465.)  For this proposition,  *Webster* cited, among other cases, *People v. Atchley* (1959) 53 Cal.2d 160, 175, footnote 4.  Although *Laws* does not mention *Gutierrez* or *Webster*, it does acknowledge *Atchley* as one of "several cases decided years ago [that] have characterized the 'gist' of lying in wait as 'watching, waiting, and concealment from the person killed *with the intention of inflicting bodily injury upon such person or of killing such person.*' "  (*Laws, supra,* 12 Cal.App.4th at p. 795, fn. 2, quoting *Atchley,* at p. 175.)  *Laws* dismisses the statements in these cases as "simply dictum," suggesting that "[i]n none of these cases was the issue posed whether lying in wait requires an intent to kill or injure."  (*Laws,* at p. 795, fn. 2.)  But "[e]ven if properly characterized as dictum, statements  of the Supreme Court should be considered persuasive."  (*United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 835.)  This is particularly true where the Supreme Court has repeated the same legal principle on multiple occasions.  This was hardly an inadvertent or ill-considered comment.

*Laws* provides little in the way of reasoning as to *why* it chose to reject this consistent Supreme Court dicta, which *Brown* now makes clear is crucial to explain the "heightened mental state" necessary to make lying-in-wait first degree murder the functional equivalent of premeditated first degree murder and distinguish it from second degree murder.  The closest *Laws* comes to offering a rationale for its conclusion is the statement that "[t]o impose such a requirement would, in effect, add an additional element to the crime of first degree murder when the murder perpetrated by lying in wait is committed with implied malice.  It would require that the killing result from an intentional act, the natural consequences of which are dangerous to human

6

life, deliberately performed with knowledge of the danger to, and with conscious disregard for, human life *and* performed with the intent to kill or injure. We have no authority to add such an element; imposition of a requirement of independent proof of intent to kill or injure 'would be a matter for legislative consideration.' " (*Laws, supra,* 12 Cal.App.4th at pp. 794–795.)

But as *Brown* makes clear, the "heightened mental state" is not an additional element. It is subsumed within the concept of "lying in wait," which includes both physical act and mental state requirements. (*Brown, supra,* 14 Cal.5th at p. 465.) The mental state component, beyond what would be required for express or implied malice, is what justifies making lying-in-wait first degree murder the functional equivalent of premeditated first degree murder.

## IV

The jurors in this case were instructed on the requirements for lying-in-wait first degree murder with CALCRIM No. 521, which does not explain the heightened mental state requirement.[3] The only reference to mental

---

[3]    The jury was instructed:

"Lying in wait. [¶] The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if, [(1)] [h]e concealed his purpose from the person killed; [(2)] [h]e waited and watched for an opportunity to act; AND [(3)] [t]hen, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. Deliberation means carefully weighing the considerations for and against a choice and knowing the consequences deciding to act."

7

state obligated the jury to find that the defendant "intended to and did make a surprise attack on the person killed." The jurors were never told they had to determine that while lying in wait for the victim, the defendant possessed a " ' "wanton and reckless intent to inflict injury likely to cause death." ' " (*Brown, supra,* 15 Cal.5th at p. 465.) In my view, this was clear error.

Later, during deliberations, the jury asked two questions indicating they were precisely focused on determining the defendant's mental state *while* he was lying in wait. Both questions suggest the possibility that some jurors thought Tyler lay in wait intending merely to *assault* Justin, and only later formed an intent to kill.[4] Neither of the court's responses clarified for the jury the heightened mental state required for lying-in-wait first degree murder.

So there was error, but was it prejudicial? CALCRIM No. 521 was not the only instruction the jury received that related to lying in wait. Tyler was

---

4     The first question inquired:

> "On page 2 of CALCRIM 521 it is stated that 'The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.'
>
> "Therefore, based on that specific language[,] [i]f a person lyed [*sic*] in wait briefly with only intent to assault, and murder ended up happening by rash decision in a state of panic then they did not 'show a state of mind equivalent to deliberation or premeditation' for murder, only for assault. Can you provide any guidance on this?"

The second question asked:

> "If the defendant premedited [*sic*] an assault and later in the confrontation deliberately killed the victim, does that constitute first degree murder or is it more closely aligned to second degree murder?"

also charged with a lying-in-wait special circumstance. (§ 190.2, subd. (a)(15).) And the jury was instructed that to find this allegation true, it must be convinced beyond a reasonable doubt that Tyler not only intentionally killed Justin, but that he intended to kill him "by taking [him] by surprise." (CALCRIM No. 728.) In other words, this instruction mandates a concurrence of the necessary physical acts—lying in wait—and culpable mental state—intent to kill. It required the jury to believe that Tyler possessed an intent to kill *while he was lying in wait*. And the jury returned a verdict form expressly concluding that Tyler "intentionally kill[ed] [Justin] while lying in wait."[5]

I agree with my colleagues that there was sufficient evidence to support this finding. (Maj. opn., *ante,* at pp. 22–24.) And because the jury ultimately concluded Tyler intended to kill Justin while he was lying in wait, the error in CALCRIM No. 521 is necessarily harmless. (See, e.g., *People v. Sedeño* (1974) 10 Cal.3d 703, 721 [failure to give instruction is not prejudicial where "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions"].)

---

5    In light of this express finding, I think it unnecessary to speculate on differences between the current version of the special circumstance statute and earlier versions in terms of the temporal connection between the lying in wait and the actual killing. The crucial issue for our purposes is the defendant's required mental state and whether he must possess it *while* he is lying in wait.

9

Accordingly, I concur in affirming the judgment of conviction.

DATO, J.